LINKER, Administratrix, Appellant, vs. BATAVIAN NATIONAL BANK OF LA CROSSE, Respondent.*

*December 8, 1943—January 18, 1944.*

* Motion for rehearing denied, with $25 costs, on May 4, 1944.

462

For the appellant there were briefs by *Stafford & Stafford* of Chippewa Falls, attorneys, and *Backus & Parson* of Milwaukee of counsel, and oral argument by *Harold E. Stafford* and *Francis H. Parson*.

*Hubert V. Fuller* of La Crosse, for the respondent.

MARTIN, J. It appears without dispute that defendant bank had the five hundred forty-nine shares of the capital stock of the Linker Realty Company in its possession as collateral at all times since July 19, 1929. It further appears without dispute that on April 6, 1936, Charles Linker executed and delivered to defendant bank his promissory note for $19,500, with interest payable sixty days after date, which was a renewal of former notes which had been renewed from time to time over a period of years; that on renewal of the note, on April 6, 1936, Charles Linker pledged as security for the payment of said note the five hundred forty-nine shares of the capital stock of the Linker Realty Company mentioned in the foregoing statement; also pledged as collateral security for the payment of said note a note of the Linker Realty Company to his order for $19,500, dated December 6, 1930. The note of April 6, 1936, contains the following provision:

"The makers hereof and the indorsers hereon, waive demand of payment, notice and protest; and surrender as collateral security Note Linker Realty 19500. 549 Sh. Linker Realty with authority to sell the same on the nonperformance of this promise, in such manner as said bank may deem proper, at public or private sale, and apply the proceeds hereon."

On June 26, 1936, defendant bank wrote Mr. Charles Linker as follows:

"Dear Sir:
"Your note for $19,500 payable to this bank, being past due and payment having been demanded and not forthcoming, we hereby notify you, that the collateral securing these notes will be offered for sale at the office of the bank at the desk of cashier, A. J. Capellen, on Tuesday, July 2d, 1936, at 10 o'clock a. m."

It is claimed by plaintiff that on the second day after receipt of the above letter Charles Linker conferred with Mr. Thomas Woolley of the city of La Crosse with reference to the subject matter of the letter and taking over his note at the bank and the collateral which the bank held as security for the payment

of its note.    It appears without dispute that Mr. Woolley did go to the defendant bank and had a conference with Mr. Klein, the president of the bank, with reference to the Charles Linker note and the collateral thereto.    There is a sharp conflict in the evidence as to the time when Woolley conferred with Mr. Klein.    With reference to this conference, Mr. Woolley testified:

"Sometime in June or July, I don't just know what month or day it was now, Charlie Linker came into my office and as a result of our conversation I went over to the bank the next morning.    I went to Mr. Klein and I said, 'I understand you have a note here against the Linker Realty Company for $19,500, and no doubt there is some accrued interest and you have Charlie Linker's stock for fifty or fifty-five thousand,' I forget just which he said it was, 'You figure up the interest and I will give you a check for the note and take the note and stock.'    He said he couldn't do that because the stock was sold. I said, 'Well, if the bank gets the money they ought to be satisfied.'    He said the stock had been sold to Capellen and that Capellen had transferred it back to the bank.    I have never been interested in the Linker Realty Company, but I did tell Mr. Klein that I was there at the instance of Mr. Linker; I was anxious to pay for that stock and take that note to Mr. Linker, who was in my office."

Mr. Klein testified that he is the president of the defendant bank, had been such since 1934; that on July 2, 1936, he sold the collateral consisting of the five hundred forty-nine shares of the Linker Realty Company stock for the sum of $1 and the note of the Linker Realty Company in the sum of $19,500 for the sum of $1,950, and credited Charles Linker's note with the proceeds of the sale of the collateral in the sum of $1,951; that said collateral was sold at private sale at the desk of the cashier of the bank to the bank's attorney for the bank.    As to his conversation with Mr. Woolley, Mr. Klein testified:

"Tom Woolley did come in to talk with me, but he did not offer to pay up that note.    I think it was sometime in September, quite a long time after the stock was sold that Tom

Woolley came in, and I told him that the stock had already been sold. He said 'Charlie is too late. He should have come to me long before.' "

He further testified:

"When Mr. Woolley came in and made the offer to give me a check for the principal and interest—and I am not ready to state he did make the offer—I told him he was too late, the stock had already been sold and the noteholders have already signed the agreement to an extension."

We cannot say that the finding that Mr. Woolley offered in plaintiff's behalf to redeem plaintiff's collateral, consisting of five hundred forty-nine shares of stock of the Linker Realty Company and a note to the plaintiff from the Linker Realty Company for $19,500, and that such offer was refused by the bank, is against the great weight and clear preponderance of the evidence. It is conceded that the collateral was in the possession of the bank or in the possession of Mr. Klein as agent for the bank at the time of Mr. Woolley's offer. It is further conceded that Mr. Woolley was financially responsible and that his check to the bank for the amount due was good. The effect of Woolley's tender to the bank is stated in Restatement, Security, p. 115, sec. 37, as follows:

"(1) Performance or tender of performance to the proper person of the obligation secured by the pledge terminates the pledge and entitles the pledgor to the possession of the pledged chattel.

"(2) The tender of the amount of a debt or the tender of performance of any other obligation secured by a pledge does not discharge the debt or other obligation for which the pledge is security.

"(3) Refusal or failure of the pledgee to return the pledged chattel upon tender or performance *is prima facie evidence of a conversion.*"

Under comment *a* it is stated:

" . . . If the pledgee refuses performance, he should not thereby be able to compel the pledgor to continue the security

relationship. The pledge is terminated and the pledgor is entitled to immediate possession of the chattel. . . ."

Under comment *b* it is stated:

"While a tender of payment of a debt secured by a pledge terminates the pledge, it does not discharge the debt. To ·make tender equivalent to payment of a debt would punish the· creditor and reward the debtor out of all proportion to the inconvenience suffered by the debtor from the creditor's refusal of the tender."

Even if there had been no tender in behalf of Charles Linker by Mr. Woolley, the sale of the collateral was voidable. While the bank had a right to sell the collateral it could not directly or indirectly become the purchaser of the collateral at such sale. In Restatement, Security, p. 145, sec. 51, the rule is stated as follows:

*"Purchase by pledgee.* (1) The pledgee, without the consent of the pledgor, does not have the privilege of purchasing the pledged chattel directly or indirectly at a public sale, except where the sale is under the control of a court of equity.

"(2) Where a pledgee purchases the pledged chattel at a public sale without the consent of the pledgor, except when the sale is under the control of a court of equity, the sale is voidable by the pledgor."

While the above text refers to a public sale, the same rule should apply with even greater strictness to a private sale as conducted in the instant case.

The rule is stated as follows in 41 Am. Jur. p. 649, sec. 90:

"There is little dissent from the proposition that a pledgee, by reason of his fiduciary relation to the pledgor with regard to the subject of ·the pledge, is incapacitated from becoming a bidder and purchasing the collateral held by him, at a sale thereof under his power, express or implied in law, so as to free the property from the pledge and secure absolute title as against the pledgor. Statutes authorizing the pledgee to purchase the security have been adopted in some of the states. Under some statutes, a pledgee is authorized to purchase at his own sale when the property is sold at public auction in accord-

ance with the manner in which such sales are required by law to be conducted."

The rule is similarly stated in 76 A. L. R. 705 under the annotation "Purchase by pledgee of subject of pledge." See cases there cited.

The respondent contends that the collateral agreement authorized the pledgee bank to purchase at the sale. This contention is based on the authority to sell as contained in the Charles Linker note of April 6, 1936, which provision is as follows : To sell the collateral "in such manner as said bank may deem proper, at public or private sale, and apply the proceeds hereon." We are not here concerned with the right of the bank to sell the collateral. Clearly the bank had such right. But there is no provision in the collateral note which authorizes the bank to become the purchaser of the collateral at a sale thereof unless such sale is under the control of a court of equity, or unless the pledgee is specifically authorized by the terms of the collateral note to purchase the collateral at a sale thereof. See *Frey v. Farmers & M. Bank* (1935), 273 Mich. 284, 262 N. W. 911. We are of the view that the evidence sustains the conclusion that there was a wrongful conversion by defendant bank of the collateral pledged by Charles Linker as security for the payment of his note of April 6, 1936.

The plaintiff's first cause of action is grounded exclusively on the theory of a conversion of the five hundred forty-nine shares of stock of the Linker Realty Company. The second cause of action is also grounded on a theory of the conversion of the five hundred forty-nine shares of stock of the Linker Realty Company, but this cause of action includes certain alleged fraudulent acts on the part of certain officers of defendant bank. There is no finding nor is there any evidence to sustain a finding of any fraud on the part of any official or representative of the defendant bank in any of its transactions with Mr. Charles Linker or the Linker Realty Company.

Plaintiff's action is one solely for damages for the conversion of the stock of the Linker Realty Company. We are

not here concerned with the note of the Linker Realty Company to the order of Charles Linker in the sum of $19,500, dated December 6, 1930, which was held by defendant bank as collateral to the note of Charles Linker, dated April 6, 1936. That collateral is not within the issues made by the pleadings.

We now reach the question of what damages, if any, were sustained by plaintiff by reason of the conversion of the Linker Realty Company stock. The referee found that the total assets of the Linker Realty Company on July 2, 1936, were $414,500; that the total of the secured and unsecured debts was $447,000. This means an actual insolvency of the Linker Realty Company to the extent of $32,500. There is ample evidence to sustain this finding. On any basis of financial calculation it means that the capital structure of the Linker Realty Company was wiped out; its capital stock had no value. The referee's finding that on said date the five hundred forty-nine shares had a value of $19,792.50 is, of course, inconsistent with the finding as to the value of the total assets and the total of the secured and unsecured debts of said Realty Company as of said date.

It appears that the referee placed the value of $19,792.50 on the five hundred forty-nine shares of Linker Realty Company stock, based on the offer Mr. Woolley had made to redeem Linker's note and collateral held by the bank. In that connection, the referee said:

"The corporation was insolvent. But Thomas Woolley's offer to redeem the stock fixes an unchallengeable value upon it. It is the simplest and most convincing proof of value."

Had Mr. Woolley taken over Linker's obligation at the bank, Linker would be owing Woolley the amount due on his note instead of the bank. It would not restore the Linker Realty Company to solvency, nor would it add anything to the value of the Linker Realty stock. What may have moved Mr. Woolley to such generosity is not disclosed by the evi-

dence. He did not testify as to the value of the stock. In view of the referee's specific finding that the Linker Realty Company was insolvent, that the liabilities of the company exceeded its total assets to the extent of $32,500, the finding as to the value of the company's stock must be set aside.

The rule as to the measure of plaintiff's damages is stated as follows in *Topzant v. Koshe*, 242 Wis. 585, 588, 9 N. W. (2d) 136:

"In the absence of exceptional circumstances in actions for the tortious taking or conversion of goods, the plaintiff is entitled to recover as damages:

" 'First, the value of the chattels at the time and place when and where the same should have been delivered, or of the wrongful taking or conversion, with interest on that sum to the date of trial;

" 'Second, if it appears that the defendant, in case of a wrongful taking or conversion, has sold the chattels, the plaintiff may, at his election, recover as his damages the amount for which the same were sold, with interest from the time of the sale to the day of trial;

" 'Third, if it appears that the chattels wrongfully taken or converted are still in the possession of the defendant at the time of the trial, the plaintiff may, at his election, recover the present value of the same at the place where the same were taken or converted, in the form they were in when so taken or converted.' . . .

" 'These rules will prevent the defendant from making profit out of his own wrong, will give the plaintiff the benefit of any advance in the price of the chattels when defendant holds possession of the same at the time of the trial, and on the whole will be much more equitable than the rule given by the court below.' "

In the instant case plaintiff claims damages for the value of the stock as of July 2, 1936. We find no evidence to warrant an assessment of more than nominal damages—six cents.

It appears that on July 27, 1936, the defendant bank commenced an action in the circuit court for La Crosse county against Charles Linker to recover upon the promissory note of Linker, dated April 6, 1936, in which action judgment was

entered against Mr. Linker on the 21st day of November, 1936, for the sum of $17,549. The respondent herein contends that that judgment is *res adjudicata* as to plaintiff in this action. Linker did not defend that action and judgment was entered against him on default. Linker might have answered and interposed a counterclaim in that action, based on the facts alleged in the instant action, but he was not obliged to do so. In *Nehring v. Niemerowicz,* 226 Wis. 285, 291, 276 N. W. 325, the court said:

"This case is within the familiar rule that, when a defendant has a counterclaim against the plaintiff that he might have interposed in the plaintiff's action against him, but did not, the fact that he might have litigated his counterclaim in that action does not prevent him from thereafter bringing an action upon it. Even failure to appear and litigate a counterclaim where it is interposed, is a withdrawal of it, and judgment for the plaintiff does not bar prosecution of the counterclaim in a subsequent suit." Citing cases.

In view of the conclusions reached, it will serve no purpose to discuss further questions presented in the briefs of counsel. Plaintiff is entitled to judgment against defendant for nominal damages—six cents. On the respondent's motion to review, the judgment will be modified by reducing same to nominal damages.

*By the Court.*—Judgment modified as indicated in the opinion and, as modified, is affirmed. Respondent to have costs.

The following opinion was filed May 4, 1944:

MARTIN, J. (*on motion for rehearing*). Plaintiff claims that the determination results in great injustice to her. We have carefully re-examined the issues as they were presented to this court, and we see no basis for modifying our determination.

The administratrix's deceased husband, Charles Linker, sued as pledgor for the conversion of collateral deposited by him. Both in the lower court and in this court it was found

that there had been such conversion. In this court it was found upon evidence that we still regard as incontestable that the value of the stock converted was nominal. Had the action been in replevin, the return of the stock in specie might have been enforced; but, having elected to put the title to the stock in the bank by suing in conversion, plaintiff foreclosed that solution. Therefore, so far as the stock is concerned, we see no way in which plaintiff can have anything but a nominal set-off. It is stated in the opinion that the foregoing disposes of all the issues in the case and an examination of the pleadings confirms this conclusion.

It is suggested by plaintiff in her motion for rehearing that the court incorrectly assumed that the $19,500 Linker Realty Company note of April 6, 1936, payable to Charles Linker, and debentures were not within the issues. The complaint makes no mention of the Linker Realty Company note, but it is claimed that this matter was litigated below, and that at the time of the sale of the collateral the note was sold and Linker credited with $1,950 upon this note, which, with others against the Linker Realty Company, were later traded in upon the reorganization of the Linker Realty Company for debentures still held by the bank. Upon this we make the following comment to clarify the situation and indicate the limits of our determination here. From all the facts it is obvious that the loan for which Linker signed his note was actually to the Linker Realty Company. The company was the principal debtor and its note for $19,500 (regardless of the fact that it was in terms payable to Charles Linker and by him turned over to the bank, and regardless of the fact that it was designated as collateral) was nothing more nor less than an integration of the principal indebtedness. As the transaction stood, Charles Linker was the guarantor or accommodation maker. Linker Realty Company was the principal debtor and the bank was the creditor. Being the principal indebtedness, the only thing that could be done with it was to pay it or default in payment. There being a default, the bank had a right

to sell the Linker Realty Company stock, which was in its hands as collateral, and apply the proceeds on the Linker Realty Company note and on the accommodation note of Charles Linker. It could, and did, sue and reduce to judgment its claim against Charles Linker as surety or guarantor. In the process of protecting itself the bank wrongfully converted the stock. This matter was fully litigated in these proceedings. ' Not only is it not alleged by plaintiff that the bank converted the Linker Realty Company note, but also this allegation could not very well be made because that was the principal indebtedness. When, and if, the indebtedness of Linker is paid to the bank, the question as to Linker's rights, (1) to cancellation of the Linker note for which he was surety, or (2) to subrogation to the bank's rights to the Linker note or that which was taken in return for it, can properly be determined. This matter is not within the issues of this case and presents possibilities that we do not intend to explore in this memorandum. These possibilities have to do with the rights under varying circumstances of a guarantor with relation to the principal debt of his principal which he has paid.

It is suggested that there is an ambiguity in the opinion as to whether the debt of Linker to the bank is wiped out by the original mandate. It is, of course, perfectly clear that it is not. The only process by which it could be wiped out would be a finding of a setoff equal to or greater than the debt itself. There was no successful attack upon the liability of Linker upon his note. The only defense was one which operated by subtraction, and since this court held that there was no value to the stock converted, the only subtraction would be the nominal amount found by the court. It follows that the liability of Linker upon the note is not affected by our determination; nor is Linker foreclosed, upon paying the judgment rendered against him in favor of the bank, from having determined and established whatever rights he may have to indemnity or subrogation.

*By the Court.*—Motion denied.